JOHN B. ALLEY *et al.*

*v.*

THE BOARD OF SUPERVISORS OF ADAMS COUNTY.

1. ESTOPPEL—*to deny permanent location of railroad on a particular route.* Where the bonds of a county, issued in aid of a railway company under a vote of the people for a corporate subscription, were deposited by the board of supervisors, to be delivered by the depositary ten per cent thereof when the road should be permanently located by a certain route named, that fact to be evi enced by the certificate of the president of the company and the agent appointed by the county, and the residue

only when it should be made to appear, by the certificate of the chief engineer of the company and the county agent, that work had been done and material provided in the construction of the road to the amount of the bonds, as called for, and it appeared that these terms were acceded to by the company, and that, for the purpose of receiving the first installment of ten per cent, the company made and procured the certificate of permanent location, by which ten per cent of the bonds were delivered to the company: *Held,* that by receiving the bonds in the manner stated, the company was estopped from denying that its road was permanently located, as represented in its certificate.

2. MUNICIPAL SUBSCRIPTION—*right to impose conditions.* Where a proposition for county subscription to a railway company to aid in building a road from Quincy, by way of Payson and in the direction of Pittsfield, in Pike county, without any other conditions, was carried by vote of the people, and it appeared that the railway company, by its charter, was not bound to locate its road on that route, but had a large discretion as to the route to be selected, it was *held,* that the board of supervisors, in making the subscription, had the right to impose conditions as to the permanent location of the road upon the route contemplated, and to make the delivery of the county bonds to depend upon the same, and that the company, by accepting such conditions, was bound by them, in respect to its rights under the vote and subscription.

3. SAME—*rendered invalid by non-observance of condition.* Where, by the terms of a county's subscription in aid of a railway company, the permanent location of the road by a certain route was an indispensable prerequisite to the delivery of the first ten per cent of the county bonds, and the company represented and certified to the permanent location of its road as it was contemplated in the conditions of the subscription, and on the faith of it obtained ten per cent of the bonds: *Held,* that this, as against the right of the company to demand the remaining bonds, would be taken as the permanent location of the road, and if the company afterwards relocated its road upon a materially different route, it could have no claim for the delivery of the remaining bonds, it not having performed the conditions on which the subscription was dependent.

4. INTERPLEADER—*proper decree on bill by depositary.* Where county bonds issued in aid of a railway company were placed in the hands of a depositary, as escrows, to be delivered to the obligee upon the performance of certain conditions thereafter by the obligee, but otherwise to be returned to the county, and it was claimed by the obligee that he had performed, and was entitled to their delivery, which fact was disputed by the county, a decree on a bill of interpleader filed by the depositary, dismissing the bill without prejudice, was held erroneous, as it failed to settle the rights of the contending parties and relieve the depositary of his responsibility.

APPEAL from the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

This was a bill of interpleader, filed by the First National Bank of Quincy, Illinois, against John B. Alley, William S. Woods, the Quincy, Alton and St. Louis Railway Company, and the Board of Supervisors of Adams county. The facts of the case and object of the bill are stated in the opinion of the court. The court below, on the hearing, dismissed the bill without prejudice to the rights of any of the parties, and decreed that Alley, Woods, and the Quincy, Alton and St. Louis Railway Company pay the costs of the suit. The complainants, Alley, Woods, and the railway company, appealed.

Messrs. SKINNER & MARSH, for the First National Bank, appellant.

Messrs. BROWNING & BUSHNELL, for Alley, Woods, and the railway company, appellants.

Messrs. WHEAT & MARCY, and Messrs. WARREN, WHEAT & HAMILTON, for the appellee.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

This was a bill in equity, brought in the Adams circuit court by The First National Bank of Quincy, in the nature of a bill of interpleader, for the protection of the complainant, in respect to certain bonds which had been formally made by the county of Adams to the Quincy, Alton and St. Louis Railway Company as the obligee, and delivered to complainant as a stranger, to be the bonds of the said county, upon future conditions, when certain things were performed by the obligee, and then to be delivered to the obligee, or, in other words, bonds held by complainant as escrows.

The appellant Woods was the contractor of the railway company for the construction of its road, and became the

equitable assignee of the bonds in question, and claimed them as such assignee. The county resisted that claim, and insisted that the conditions of the escrow had not been performed, and for that reason and others Woods was not entitled to them, and that they should be withdrawn by the county from the depositary.

By the first section of the act incorporating the Quincy, Alton and St. Louis Railway Company, authority was given the company to locate and construct a railroad from the city of Quincy to Alton, by way of the *township* of Payson, from thence to a point within the State of Illinois opposite the city of St. Louis ; to lay out their road upon the most eligible and practicable route : *Provided,* that it should not be located more than half a mile west of the bluff in the Mississippi river bottom in Adams county or Pike county, further than a point one mile south of Mill creek, in Adams county.

For some reason, perhaps owing to the limitations upon the route and the want of means, nothing was done under this charter until after an amendment was made by the legislature, by an act of the 29th of March, 1869, which provided "that said company should have power to construct and operate a *branch* railroad from any point in the *route* of the *same,* to and connecting with any railroad built or to be built, extending eastwardly toward the east line of this State." (3 Pri. Laws 1869, 341.)

The acts referred to contemplated a railroad from Quincy southward; and it appears that in order to have one from the same place northward, an act had been passed the 16th of February, 1865, incorporating the Quincy and Warsaw Railroad Company, and authorizing the construction and use of a railroad from Quincy, Adams county, to the city of Warsaw, in Hancock county. No action having been taken under either charter, on the 9th of April, 1869, and before the first mentioned charter was amended, another act had been approved and then became a law, entitled "An act to authorize certain counties and towns to aid public improvements,"

by the first section of which it was provided that the county of Adams, including the city of Quincy, might subscribe for stock in any two companies organized or to be organized for the construction, severally or jointly, of two railroads, one from the city of Quincy northward, by way of the *town* of Mendon, to the *town* of Carthage, etc., and one from the city of Quincy southward, by *way* of the *town* of Payson, in the direction of Pittsfield, in Pike county, and beyond, in an amount, to each of said companies, not exceeding $200,000, or to both a sum not exceeding $400,000, to be equally divided. The second section provided that the subscriptions should be payable in the bonds of the county, in installments, as private subscriptions are called for; prescribed the time the bonds were to run, the rate of interest, and that they should be under the act entitled "An act relating to county and city debts, and to provide for the payment thereof by taxation in such counties and cities," approved February 13, 1865, and declared that said act should be applicable to these bonds.

The fifth section provided for the manner of submitting the proposition for subscription to the legal voters of the county.

The seventh authorized the board of supervisors of each county to appoint two persons to represent the stock of the county. The act went into force from and after its passage. (Pub. Laws 1869, 202.)

Afterwards, and on the 16th of April, 1869, the legislature passed another act relating to the same subject, and declared that it should take effect from its passage, entitled "An act to fund and provide for paying the railroad debts of counties, townships, cities and towns," the seventh section of which contained the following provision: That "any county, township, city or town, shall have the right, upon making any subscription or donation to any railroad company, *to prescribe* the *conditions* upon which such bonds, subscriptions or donations shall be made; and such bonds, subscriptions or donations shall not be valid and binding until such conditions

precedent shall have been complied with." (Pub. Laws 1869, 319, 320.)

Afterwards, and on the 16th day of September, 1869, in pursuance of a petition, under the aforesaid act of the 9th of April, 1869, the board of supervisors of Adams county ordered an election to be held in that county on the 2d day of November, 1869, that the legal voters of the county might vote upon the question whether or not the county should subscribe $400,000 to the capital stock of said Quincy, Alton and St. Louis Railway Company, to aid in building a railroad from said Quincy, by way of Payson, and in the direction of Pittsfield, in Pike county, in said State, and to aid in building a railroad from said Quincy, by way of Mendon, to Carthage, in Hancock county, etc.—said amount to be equally divided between said companies, etc.  The proposition for subscription was carried, and no question is made as to the regularity of the election.

On the 9th day of December, 1869, the board of supervisors of Adams county made an order directing the chairman to make the subscription of $200,000 to each of the railroad companies mentioned, payable in bonds, which were to be for $1000 each, payable in twenty years, with six per cent interest, payable annually, to bear date the 1st day of January, 1870, to be under the corporate seal of the county, signed by the chairman and countersigned by the clerk of the board. And it was further ordered, that said bonds, when so executed, should be deposited by the chairman and clerk with the First National Bank of Quincy, Illinois, not to be registered until after delivery in payment of said subscriptions, respectively; "and that said bonds shall, by said bank, be delivered to said respective railroad companies *only* in manner following, that is to say : ten per cent of said bonds applicable to subscription to the stock of each company shall be delivered to such company when such company shall *have surveyed* and *permanently* located *its railroad* from Quincy to the county line of this county, to appear by the certificate of the president of

such railroad company and of one of the county agents here-
inafter appointed ; and the residue of said bonds shall be de-
livered in payment of said subscriptions, respectively, *only
when* and *as* the company calling for the same shall show by
the certificate of the chief engineer of such company and of
either of the county agents hereinafter appointed, or of their
successors, that work has been done and material provided
on and in the construction of *said company's* railroad in Adams
county, to the amount of the principal sum of the bonds so
there called for; and upon each payment in bonds of said
county, made as aforesaid, the said county shall receive there-
for certificates of stock of the company to which such pay-
ment is made, equal, dollar for dollar, to the principal of the
bonds so delivered.   And it is further ordered, that the said
chairman and clerk shall, on depositing said bonds with the
said First National Bank, take from said bank a proper re-
ceipt therefor, in which shall be expressed the *condition* and
purposes of said deposits.   And if said First National Bank
shall refuse to accept said deposits on the terms aforesaid,
then the same may be made with any bank in Quincy which
will receive the same on the terms aforesaid, to be selected
by said chairman and clerk."   The order also appointed the
two county agents, Maurice Kelly being the one in respect to
the Quincy, Alton and St. Louis company.

The bank had no interest in the principal transaction, but
was a mere stranger.   It accepted the bonds, and, in respect
to those running to the Quincy, Alton and St. Louis company,
which are the only ones in question, on the 16th day of March,
1870, executed an instrument, under its corporate seal and
the hand of its cashier, acknowledging the delivery to it, on
behalf of the county of Adams, of two hundred of said bonds,
made under the order above mentioned, and declaring that
they were "to be by said bank delivered to said railroad com-
pany *in* and *only* in the manner following, that is to say," and
then setting out in full the conditions of the order, as above

set forth.  The Quincy, Alton and St. Louis company, professing a willingness to construct a railroad on the course designated by the act authorizing the subscription, fully acceded to the act of the board of supervisors in prescribing the conditions upon which the bonds were to be delivered, and proceeded to made a survey of the line of the road, and professedly to permanently locate it.  This done, about the 26th of March, 1870, the company caused a certificate to be made, obtained the signature of the county agent thereto, and presented it to the bank.  It is as follows:

"QUINCY, ILL., *March* 26, 1870.

"We, the undersigned, in *observance of the order of the* board of supervisors of Adams county, do hereby certify to the First National Bank of Quincy, Illinois, that the Quincy, Alton and St. Louis Railroad is *permanently* located, from the city of Quincy to the southern boundary of said county, and that the said railroad company are now entitled, under said order, to $20,000 of the bonds of said county, applicable to said company, and deposited with said bank for delivery, as aforesaid, which appears from the certificate of the president of said company, under the order of the board of directors of said company, and the field notes of the survey thereof.

JAMES W. SINGLETON,
*Pres. Quincy, Alton and St. Louis R. R. Co.*

MAURICE KELLY,
*Stockholder of County.*

There is a township in the county of Adams called Payson, and towards the northwest corner of the township is an incorporated village or town of the same name.  This circumstance makes the act authorizing the subscription somewhat ambiguous, the language being "to aid in building a railroad from the city of Quincy southwardly, by way of the *town* of Payson, in the direction of Pittsfield, in Pike county," etc. It is claimed by the appellees that the voters and county authorities understood that the village, which was commonly

known as the *town* of Payson, was the point to be reached by the road. By the survey accompanying said certificate, it appears that the company so understood the meaning of the act at that time, for the line established by that survey and pretended permanent location, referred to in the certificate, was from Quincy southwardly to the village of Payson, and then beyond to the county line, in the direction of Pittsfield, in Pike county. This line was clearly within the act, and, therefore, on presentation of the certificate, ten per cent of the bonds (being $20,000) was, upon the faith thereof, delivered to the company.

After these bonds were so obtained, and on the 1st day of August, 1870, the board of directors of the railway company, by resolution, empowered the president of the company to re-locate the railroad, to dispose of stock of the company, the bonds of Adams county and of the town of Payson, for the purpose of constructing and equipping their railroad, and to enter into contracts for the purpose. Full power was given him in the premises. Accordingly on the 26th of October, 1870, the president concluded a contract on behalf of the company, with Woods, for such construction and equipment of the road which was provided in the contract to be a line of railroad from the public landing on the Mississippi river at Quincy to a point on said river in this State opposite the city of Louisiana, in the State of Missouri, etc., upon such practical line and route as should be finally determined upon by the chief engineer.

We have looked, and looked in vain, through this contract for anything which manifested an intention on the part of the company to require any adherence to the route or course prescribed by the act authorizing the county subscription, or which had been previously located. We do find, however, ample authority to wholly depart from that course.

There is an intention manifested to obtain the county bonds; for the contract professes to assign them over to Woods, and the order of the board of supervisors prescribing

the conditions of the delivery is referred to and made a part of the contract. On the 7th of November, 1870, this contract was, by resolution, expressly approved by the board of directors of the railroad company. Under the authority thus conferred, a new line, within Adams county and beyond, was surveyed and permanently located, materially different from the former one, running west of the bluff and in the river bottom. Instead of being by the way of the village of Payson, as the former one was, and in the direction of Pittsfield, it is some three and a half miles southwest of the village of Payson, and merely touches the southwest corner of the township. Instead of being in the direction of Pittsfield, in Pike county, as the other was, it is ten and a half miles southwest of the village of Pittsfield, and several miles southwest of any part of Pittsfield township.

The road was built, equipped, etc., on the newly surveyed line, upon which, within Adams county, money was expended by Woods, as contractor, or the company, for work done and materials furnished, to an amount equal to if not in excess of the $180,000 of bonds in the hands of the bank, under the conditions as before mentioned. Under these circumstances the bonds were demanded by Woods, who possessed all the authority to receive them which the railroad company could give him; but the bank, acting under the instructions of the board of supervisors, refused to deliver them, and the question is, was Woods entitled to them?

It will be observed that the act authorizing the county subscription did not mention any particular railroad company whatever; consequently the company which should qualify itself to come within the provisions of the act, and receive the benefits contemplated, was one which should build a railroad on the course designated by that act. The construction of one substantially variant would not be a compliance, and it would be a perversion of the county bonds for the supervisors to apply them to such road.

Now, under these circumstances, the Quincy and Alton company professed itself willing and held out to the county authorities that it would build the road designated by the statute authorizing the subscription.   Therefore the vote was taken upon the question of subscribing the $200,000 to that company, "to aid in building a railroad from Quincy, by way of Payson, and in the direction of Pittsfield, in Pike county." At the election there was a majority in favor of that proposition.   This being done, the supervisors, no doubt desirous of protecting the interest of the county and prevent a perversion of the bonds, perceived that here was a railroad company of doubtful solvency seeking the acquisition of the benefits proposed, but which, by its charter, was not compelled to construct its road on the particular course designated by the act authorizing the subscription, but might, within its charter, adopt a route entirely variant therefrom and yet obtain the bonds, and transfer them to *bona fide* holders—when to let the company have them would be a palpable perversion of the bonds.   How was this danger to be guarded against? The plan devised for the protection of the county, was that embodied in the order prescribing the conditions on which alone the bonds were to be delivered by the bank to the company.

The provision of that order, requiring a survey and actual permanent location of the road and a certificate of that fact, as a condition precedent to the delivery of the ten per cent of the bonds, was designed, without doubt, to afford an opportunity of knowing, before any delivery was made, that the road was, in fact, to be located on the course designated by the act authorizing the county subscription, and the call for the election made by the board of supervisors.   By means of that opportunity a perversion could be prevented.   If the road located was clearly variant from the course designated, while that would not affect the right of the company to proceed with its construction, yet it would end all claim on its part to the bonds.

If it was so far variant as to make it fairly questionable whether it was not outside of the course prescribed as the basis of subscription, then the supervisors would have the right, and it would, perhaps, have been their duty, to contest the company's claim to the bonds, and they could have done so without jeopardy.

That condition being prescribed for such a purpose, which is apparent upon the face of the order, the subsequent one is easily understood. It might have been couched in more explicit language, but when the whole order is looked at there is no doubt as to its meaning. The condition that the residue of the bonds should be delivered *only when and as* the company should show, by the certificate of its engineer and the county agent, that work had been done and materials provided on and in the construction of said company's railroad in Adams county, means, and can admit of no other interpretation, said company's railroad in Adams county, which had been previously shown, by the certificate provided for, to have been permanently located. What other railroad could have been meant?

This is the fair and ordinary import of the language employed, and the company and its contractor must be deemed to have so understood it. We have no doubt as to the authority of the board of supervisors to prescribe these conditions. They were obviously necessary for the protection of the tax payers against a perversion of the bonds of the county; and, besides, the railroad company fully assented to the terms of the escrow. Consider the language of the certificate upon which ten per cent of the bonds was obtained : "We, the undersigned, in *observance* of the *order of the board of supervisors* of Adams county, do certify to the First National Bank of Quincy, that the Quincy, Alton and St. Louis Railroad is *permanently* located, from, etc., to, etc., and that said company are now entitled, under said order, to $20,000 of the bonds of said county applicable to said company, and

deposited with said bank for delivery, as aforesaid." Nothing could be plainer than at this time the company had acceded to the conditions of the order, and professed to have complied with the first and most essential of those conditions, viz: the permanent location of its road, and upon a line that was unquestionably within the provisions of the act for the subscription.

That certificate was made for the purpose of obtaining the ten per cent of the bonds. Upon the faith of it they were delivered to the company, and it becomes thereby estopped from alleging that the road was not permanently located, as represented.

We have seen that to the right of receiving the ten per cent of the bonds, the permanent location of the road was an indispensable prerequisite. That to the right of receiving the residue of the bonds, the doing of work and furnishing materials upon and for the road so permanently located, to an amount equal to that of said remaining bonds, was also an indispensable prerequisite. Now, as between the county and railroad company, or its assignee, with notice, as here, for the purpose of determining the question of performance of the conditions precedent by the company, the road, which was so surveyed, represented and certified as that permanently located, for the purpose of obtaining the ten per cent of the bonds, and on the faith of which they were delivered, must be deemed and taken to have been in fact permanently located, and to be the road or line upon which the work and materials should have been bestowed, in order to a delivery of the residue of the bonds. To hold otherwise would be to sanction a gross imposition upon the county, by permitting the company to unjustly deprive it of the very means provided by the terms of the escrow, to which the company assented, for the prevention of a misapplication of the bonds to the construction of a road not upon the line designated by the statute; for it is obvious that the fact whether or not the

8—76TH ILL.

road was upon such line could be determined only when a permanent location was made.

The company had, it is true, the general inherent right to re-locate its road, within the limits prescribed by its charter, which gave a large discretion ; but after assenting to the conditions prescribed by the board of supervisors, upon which alone the bonds were to be delivered, and obtaining ten per cent of the bonds upon a professed compliance therewith, in respect to the permanent location of its road, the company, and its assignee, with notice of the conditions, became estopped and precluded by their acts from afterwards relocating the road upon a line substantially variant from that of such professed permanent location. on the making and certification of which the ten per cent of the bonds had been obtained, and from claiming that the work and materials done and furnished upon this new and variant line were bestowed upon that contemplated by the order of the board of supervisors prescribing the conditions upon which the bonds were to be delivered. After obtaining ten per cent of the bonds upon the professed permanent location of the road upon the line contemplated by the act authorizing the subscription or donation, the change, without the assent of the board of supervisors, operates as a fraud, both upon the statute and the tax payers of the county. At all events, it is not a performance of the condition upon which alone the bank was authorized to deliver the bonds to the railroad company. This being the case, the question arises, what disposition shall the bank make of them ? It desires to be rid of the responsibility of their custody. To have that question determined was the object of this bill of interpleader.

It is manifest, from the conclusions arrived at, that the decree should have settled the rights of the parties. The bank is a mere stakeholder. On one hand, the assignees of the railroad company claim that they are entitled to the residue of the bonds ; on the other, the board of supervisors insist that the conditions on which they were to be delivered have

not been performed and never can be, and therefore they should be permitted to have them returned to their custody. As already indicated, we are of opinion that neither the railroad company nor its assignees is entitled to them, and that the bank be authorized to restore them to the county, on demand by the proper authority.

The decree of the court below simply dismissed the bill without prejudice, and the railroad company, and Alley and Woods, appeal to this court. The decree was improper. It failed to settle the rights of the contending parties, and will, therefore, be reversed and the cause remanded, with directions to enter a decree in conformity with the views herein expressed.

Under the circumstances of this case, the costs in this court will be equally divided between the appellants and the board of supervisors.

*Decree reversed.*

Mr. JUSTICE SCOTT dissenting.

Mr. CHIEF JUSTICE WALKER: I am unable to concur in the conclusion announced in this opinion.